67 P.3d 768

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Casey DUNCAN, Defendant–Appellant.**

No. 22491.

Supreme Court of Hawai'i.

April 28, 2003.

Richard S. Kawana, Honolulu, On the briefs, for defendant-appellant.

Simone C. Polak, Deputy Prosecuting Attorney, On the briefs, for plaintiff-appellee.

MOON, C.J., LEVINSON, NAKAYAMA, and ACOBA, JJ., and Circuit Judge CHANG, Assigned by Reason of Vacancy.

Opinion of the Court by MOON, C.J.

Following a jury trial,[1] defendant-appellant Casey Duncan was convicted of theft in the first degree, in violation of Hawaii Revised Statutes (HRS) § 708–830.5 (1993). On appeal, Duncan contends that the trial court: (1) made erroneous evidentiary rulings with respect to the testimony of certain witnesses; (2) erred in denying his motion for withdrawal and substitution of counsel; (3) erroneously instructed the jury regarding the presumption of innocence; and (4) abused its discretion in imposing a ten-year term of imprisonment. Duncan also contends that there was insufficient evidence to support his conviction of theft in the first degree.

For the reasons discussed herein, we hold that the trial court erred in allowing the prosecution to elicit testimony from a witness without first requiring the prosecution to lay the proper foundation, pursuant to Hawai'i Rules of Evidence (HRE) Rule 613. Accordingly, we vacate Duncan's conviction of and sentence for theft in the first degree and remand this case for further proceedings consistent with this opinion.

## I. BACKGROUND

At trial, several witnesses testified, including Duncan. The substance of their testimony is summarized below.

### A. Lynette Stefanov

Lynette Stefanov is the district manager of the Sultan Company, which owns jewelry stores throughout the United States. Stefanov testified that HF Wichman, Sultan's Kā'anapali store, was robbed on June 12, 1997. The jewelry taken from the store had a retail value of $1,403,841.94 and a wholesale value of $553,701.00. Stefanov testified that Pamela Rogers was an employee at the HF Wichman store and resigned after confessing her involvement in the theft to the police.

### B. Detective Karl Freitas

Detective Karl Freitas of the Maui Police Department, who was in charge of the investigation, testified that, on July 29, 1997, Rogers gave a statement implicating herself, as well as Scott Tempkins and Norman Kaui, in the commission of the theft. After Rogers confessed, Freitas canvassed jewelry stores and pawn shops in the area for information, including Maui Gold Manufacturing, where Freitas spoke with the owner, Brian McCoy, and one of his employees, Casey Duncan. Freitas testified that he spoke to Duncan "face-to-face" on about three occasions regarding the theft, but Duncan did not provide any information.

### C. Norman Kaui

Kaui, testifying pursuant to a plea agreement entered into with the prosecution, stated that he and Tempkins decided to involve Rogers, Duncan, and another individual, identified as Tim Schroeder, in the crime. Kaui testified that he offered to pay Duncan $300 in exchange for melting gold for a few hours. Duncan agreed. On June 12, 1997, Duncan met Kaui at a room in the Embassy Suites Hotel to melt gold. They were joined by Schroeder and Tempkins, who arrived at the hotel room, carrying a large backpack and leather briefcase. Kaui testified that Tempkins unloaded the stolen jewelry from the backpack and briefcase onto the floor. Kaui observed that Duncan looked "pretty amazed and surprised." Kaui, Tempkins, and Schroeder proceeded to remove the price tags and gemstones from the jewelry. Kaui then instructed Duncan to set up his melting dish and start melting the gold. Duncan complied. According to Kaui, after Duncan had melted the gold for about fifteen minutes, the smoke alarm went off, and everyone

---

1. The Honorable Shackley F. Raffetto presided over both the trial and pretrial proceedings.

packed up and left the hotel. Before leaving, Kaui told Duncan, "Don't worry about it. I'll just call you." Kaui also noted that, at some point before Duncan started melting the gold, he paid Duncan $300 and a "little bag of marijuana." Kaui stated that neither he nor Tempkins verbally threatened Duncan, but that Tempkins had "waved [his] gun around." Further, on redirect examination, Kaui testified that there was "[n]o way" that Duncan could have walked out at any time from the hotel room and say that he did not want to be a part of the theft.

Kaui also testified that he called Duncan the following morning to arrange another meeting at the hotel to finish melting the gold. Kaui noted that Duncan seemed "nervous" and that he "had to talk [Duncan] into" meeting him again. Kaui stated, "I talked [Duncan] into this. I asked him over and over, I said [Duncan], you have to do this. I said, I know it's not—it wasn't planned like that. I'm sorry." Duncan finally agreed to return on the condition that he be paid another $300 and that "all the stones [be] taken out of the jewelry by the time he [got] there" to do the melting. That evening, Duncan arrived at the hotel and spent about three or four hours melting the rest of the gold.

On cross-examination, Kaui admitted that Duncan did not know that there would be a theft when his services were first procured. Kaui also related that, while at the hotel on June 12, 1997, Tempkins had his shirt open, which revealed his "muscular" build and "a number of tattoos," one on his stomach reading "criminal minded." Moreover, Tempkins was carrying a "black automatic handgun" and seemed "nervous and excited." Kaui stated that he felt "threatened" by Tempkins's behavior and that he was forced to call Duncan the next day about finishing the melting of the gold. Kaui noted that Duncan was not only reluctant to come back, but "reluctant to even hear from" Kaui.

### D. Defendant Casey Duncan

Duncan testified on his own behalf, stating that Kaui had approached him with a job to design a "panther pin" and to melt down some gold, which was nothing unusual in the jewelry business. Duncan agreed to meet Kaui at the Embassy Suites Hotel. He met Kaui and Schroeder at the hotel restaurant and was paid $300. Thereafter, the three men went to the hotel room. According to Duncan, when Tempkins arrived at the hotel room, he spoke to Kaui and Schroeder for some time. Tempkins and Schroeder then left the room and returned with "two big duffle bags." Duncan stated that he became "very nervous," explaining:

> Everything was happening. The air in that place just went static. [Tempkins] took his shirt off almost immediately, his top of his jump suit revealing his body which was covered in tattoos and letters about this size across his stomach and chest, a very legible I read "criminal minded."

> He had a very large handgun right in his belt underneath that. He had tattoos on his chest and on his arms and was sweating profusely, and was very anxious, very muscular man also.

> He unloaded the—he put the bags in the bathroom and unloaded them. While I was not—I was in the living room still at this time, up and down off the couch very nervous about what was happening, still not knowing what was going on.

> . . . .

> The way he was moving[,] the gun had kind [sic] came out of his pants one to three times while this was happening before. He was cocking the gun, taking it out, putting it back in the pants, going to the balcony through the bedroom back through the bathroom. Was acting very, very nervous and very anxious.

Duncan testified that he noticed the price tags on the jewelry and admitted that he "assumed that they had robbed a jewelry store." When Kaui told Duncan to start melting the gold, Duncan stated: "At that point I was trying to clear my mind of what was happening. At that point I knew that I could not walk out of that hotel room, and I knew that the consequence of walking out of that hotel room would be drastic to me."

A short time after he started melting the gold, the smoke alarm went off, and Duncan stated, "I almost was thankful because I

thought that this was it; that was the end. Some type of security or authority figure would come into the room and discover what was going on, which didn't happen[ ]." In the presence of Tempkins, Kaui instructed Duncan to pack up his tools, go directly home, and "not to stop for any reason." Duncan complied. On the way home, Duncan received a call on his cellular phone from Kaui, who again instructed him to go directly home. Once at home, Duncan received another call from Kaui, who tried to calm him down. Duncan stated that he did not call the police because he "was in fear for [his] life." Specifically, Duncan testified:

> These men were—obviously had robbed a jewelry store at gun point. And the man, Scott Timkins [ (sic) ], was very life threatening to me. That evening he did not verbally accuse or threaten my life, but in a bunch of different ways he threatened my life that night. And I was scared for my life.

> And they told me not to talk to this [sic] to anyone and absolutely do not talk to the police about this, and so I did not. I was very scared and confused, and I did not contact the police.

According to Duncan, Kaui phoned him the next morning and told him that he had to return to the hotel to finish melting the gold. Kaui also told Duncan, "I'll do whatever it takes to get you back," which Duncan interpreted as a threat. After the phone call, Duncan "reluctantly" went back to the hotel, where he met Kaui and Tempkins, who had his gun at his side. Kaui gave Duncan another $300. Although he claimed he was "very, very, very uneasy and nervous and sick to [his] stomach about this whole thing," Duncan melted the rest of the gold. When he was finished, Kaui and Tempkins warned Duncan to keep quiet and not go to the authorities. They also informed him that "they would be in contact with" him, which scared Duncan.

Duncan testified that he thought his life was "in jeopardy from [Tempkins]." Therefore, he no longer stayed in Lahaina after work to "hang out with some friends," but rather went straight home. About a week or two after melting the gold, Duncan saw Kaui and Tempkins at an intersection, and they again instructed him to keep quiet. About a month later, Kaui and Tempkins visited Duncan at work. At that time, Kaui "kind of jokingly, but it wasn't joking to me at all, motioned with like a gun in his hand putting his foot on someone's throat .... And said, 'If anyone were to rat on us, pow, we'd wack them.'" Duncan understood this to be an "absolute threat against [his] life."

On cross-examination, Duncan denied having asked for $300 more to finish melting the gold. Duncan conceded, however, that, "despite being given opportunities to admit to the police [his] knowledge and role in this theft, [he] never did so prior to [his] arrest." Shortly after his arrest, Duncan stated he left Hawai'i and refused to return voluntarily.

Rogers, the employee of the HF Wichman jewelry store, was also called as a witness; the prosecution called Brian McCoy, the owner of Maui Gold Manufacturing and Duncan's employer, and another detective from the Maui Police Department, Richard Staszyn, as rebuttal witnesses. The testimony of and events surrounding these witnesses are summarized and discussed *infra* in connection with the analysis of the points raised on appeal.

The jury returned a verdict of guilty on the first degree theft charge, and Duncan timely appealed.

## II. DISCUSSION

Because the trial court's evidentiary rulings in this case are dispositive, we need not address Duncan's remaining points on appeal, except for his final contention that there was insufficient evidence to support his conviction. We begin our analysis by addressing the evidentiary rulings.

### A. Evidentiary Rulings

#### 1. Standards of Review

■ "Different standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue." *State v. Staley*, 91 Hawai'i 275, 281, 982 P.2d 904,

910 (1999) (citations, brackets, and internal quotation marks omitted). With respect to HRE Rule 403, "which require[s] a 'judgment call' on the part of the trial court," the appropriate standard of review on appeal is abuse of discretion. *Id.* (quoting *Walsh v. Chan,* 80 Hawai'i 212, 215, 908 P.2d 1198, 1201 (1995) (citation omitted)). "An abuse of discretion will be found where the trial court clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." *State v. Pacheco,* 96 Hawai'i 83, 94, 26 P.3d 572, 583 (citation and internal quotation signals omitted), *reconsideration denied,* 96 Hawai'i 83, 26 P.3d 572 (2001).

■ In contrast, evidentiary rulings concerning relevance under HRE Rule 402, inasmuch as the application of the rule can only yield one correct result, are reviewed under the right/wrong standard. *See State v. White,* 92 Hawai'i 192, 204, 990 P.2d 90, 102 (1999).

■ Similarly, the admission of evidence of bias or motive under HRE Rules 609.1 or 613(b) is reviewed under the right/wrong standard. *See State v. Ortiz,* 91 Hawai'i 181, 189, 981 P.2d 1127, 1135 (1999), *as amended on reconsideration; State v. Kauhi,* 86 Hawai'i 195, 197, 948 P.2d 1036, 1038 (citing *State v. Balisbisana,* 83 Hawai'i 109, 114, 924 P.2d 1215, 1220 (1996)), *reconsideration denied,* 86 Hawai'i 195, 948 P.2d 1036 (1997).

■ With respect to the admissibility of rebuttal testimony, the standard on appeal is abuse of discretion. This court has declared that " '[t]he introduction of evidence in rebuttal and in surrebuttal is a matter within the discretion of the trial court and appellate courts will not interfere absent abuse thereof.' ". *Takayama v. Kaiser Foundation Hosp.,* 82 Hawai'i 486, 495, 923 P.2d 903, 912 (1996) (quoting *Yorita v. Okumoto,* 3 Haw. App. 148, 156, 643 P.2d 820, 826 (1982) (citation omitted)).

**2.** HRE Rule 403 provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

### 2. Issues Relating to the Testimony of Rogers

#### (a) *background*

At trial, Rogers was first called as a witness by the prosecution. On cross-examination, Rogers testified that, after she started working at the jewelry store, Tempkins began "to tell [her] essentially kind of frightening stories about his activities." When defense counsel asked about the nature of these stories, the prosecution objected, claiming that the testimony would reveal "prior bad acts that are unsubstantiated and did not result in convictions of [Tempkins]." The court observed that "[t]here's no evidence to show that Mr. Duncan knew any of these stories." In response, defense counsel argued that the testimony was relevant to show how Tempkins and Kaui "get people involved and did the same thing with Casey Duncan" and that it, therefore, supported Duncan's defense of duress. Although the court sustained the prosecution's objection, defense counsel requested that he be allowed to ask only general questions about the nature of the stories because the prosecution had raised the issue of Tempkins telling stories to Rogers. The prosecution again objected, and the court sustained the objection under HRE Rule 403.[2]

Rogers was subsequently recalled as a defense witness during its case-in-chief and testified that, approximately one week before the theft, Kaui and Tempkins had told her stories about the "dire consequences" suffered by people who had crossed them. Rogers stated that she believed Kaui and Tempkins told her the stories "so that [she] would be scared enough to cover for them."

#### (b) *analysis*

■ On appeal, Duncan claims that the trial court erred in refusing to allow Rogers to testify about the "frightening stories" of Tempkins's prior bad acts pursuant to HRE Rule 403. Duncan argues that Rogers's tes-

misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

timony supported the defense's theory of duress.

The defense of duress is codified in HRS § 702–231 (1993) and states in relevant part:

(1) It is a defense to a penal charge that the defendant engaged in the conduct or caused the result alleged because he [or she] was coerced to do so by the use of, or a threat to use, unlawful force against his [or her] person or the person of another, which a person of reasonable firmness in his situation would have been unable to resist.

. . . .

(5) In prosecutions for any offense described in this Code, the defense asserted under this section shall constitute an affirmative defense. The defendant shall have the burden of going forward with the evidence to prove the facts constituting such defense, unless such facts are supplied by the testimony of the prosecuting witness or circumstance in such testimony, and of proving such facts by a preponderance of the evidence pursuant to section 701–115.

There are no Hawai'i cases that address whether evidence of a third party's prior bad acts may be introduced to support a defense of duress. We, therefore, look to other jurisdictions for guidance.

In *State v. Bockorny*, 124 Or.App. 585, 863 P.2d 1296 (1993), the defendant was convicted of five counts of aggravated murder and one count of murder after she and her husband were tried separately for causing the victim's death. The defendant asserted the defense of duress, claiming that her husband's violent and abusive character "was an essential element of her defense of duress because she had to show that her fear of him was reasonable." *Id.* at 1298. The Oregon Court of Appeals disagreed, holding that the husband's "violent relationship with a former girlfriend, his past convictions[,] and his prior bad acts *were not relevant* or essential to showing that, at the time [the defendant] committed her criminal acts, she was compelled to do so." *Id.* (emphasis added).

Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." HRE Rule 401. In the present case, the defense sought to introduce testimony by Rogers regarding stories she had overheard about Tempkins's prior bad acts. However, *Rogers's* knowledge of Tempkins's past acts could not make *Duncan's* claim of being coerced into melting the gold more or less probable. As the *trial* court observed, there was no evidence that *Duncan* knew any of the stories about Tempkins's past acts. Accordingly, we hold that Rogers's testimony regarding Tempkins's prior bad acts was not relevant to Duncan's claim of duress and was, therefore, inadmissible under HRE Rule 402 (providing that "[e]vidence which is not relevant is not admissible").

We recognize that the trial court in the present case excluded Rogers's testimony based on HRE Rule 403, which presupposed that the evidence sought to be admitted was relevant evidence. Nevertheless, "we have consistently held that where the decision below is correct it must be affirmed by the appellate court even though the lower tribunal gave the wrong reason for its action." *State v. Taniguchi*, 72 Haw. 235, 240, 815 P.2d 24, 26 (1991) (citing *State v. Rodrigues*, 68 Haw. 124, 134, 706 P.2d 1293, 1300 (1985) (citation omitted)). Thus, we affirm the trial court's ruling regarding Rogers's testimony.

### 3. Prosecution's Rebuttal Witnesses

As previously stated, the prosecution called Duncan's employer, Brian McCoy, and Detective Richard Staszyn as rebuttal witnesses. On appeal, Duncan argues that the prosecution failed to lay proper foundations under HRE Rule 609.1 for McCoy's testimony and under HRE Rule 613 for Staszyn's testimony. Duncan also argues that the testimony of both rebuttal witnesses should have been presented in the prosecution's case-in-chief and, therefore, constitutes improper rebuttal. We address each witness separately.

#### (a) *McCoy's testimony*

McCoy was called as a witness by the prosecution to rebut a portion of Duncan's

testimony. On recross-examination, the prosecution had asked Duncan whether he recalled McCoy giving him advice regarding this case. Defense counsel objected to the prosecution's line of questioning, arguing that the question assumed facts not in evidence and that the answer to the question would elicit inadmissible hearsay. The trial court sustained the defense's objection. The prosecution then asked Duncan, without objection, "Did you speak to Mr. McCoy after he had learned of your arrest and involvement in this case?" Duncan responded that he had.

On direct examination of McCoy, the prosecution asked McCoy whether he recalled speaking to Duncan after he was released from police custody. Defense counsel objected, arguing that McCoy's testimony was improper rebuttal. The prosecution responded that McCoy's testimony was intended to rebut Duncan's claim that he was telling the truth by showing his motive to fabricate. The trial court allowed the prosecution to continue its line of questioning:

Q. [By the prosecution] Thank you. Sir, as I was saying, do you recall speaking to Casey Duncan and giving him advice regarding this particular case and these changes?

A. [By McCoy] Yes.

Q. And when you spoke to him, do you recall telling him the only way he would or could deal with this was to try and convince everybody that he must be the biggest village idiot in town or the most naive guy in town?

A. That was not quite the wording—I think the actual wording was that—through a series of decisions—had [sic] transformed himself from rather than a heroic character into only being able to survive by establishing himself as the village idiot.

Q. To try and rely on that and convince people of that?

A. Perhaps it's a poor thing to say, but I was angry.

■ In his objection before the trial court, Duncan argued that McCoy's testimony constituted improper rebuttal. Insofar as Dun-

can did not raise an objection based on HRE Rule 609.1 before the trial court—as he does now, we decline to address this ground on appeal. *State v. Matias*, 57 Haw. 96, 101–02, 550 P.2d 900, 904 (1976) (holding that objection based on a specific ground constitutes waiver of all other objections).

■ With respect to the specific ground raised below, we note that this court has followed three general rules regarding rebuttal evidence:

First, as a general rule, a party is bound to give all available evidence in support of an issue in the first instance it is raised at trial and will not be permitted to hold back evidence confirmatory of his or her case and then offer it on rebuttal. Second, this general rule does not necessarily apply where the evidence sought to be presented on rebuttal is "negative of a potential defense," even if the evidence is also confirmatory of an affirmative position upon which the party seeking to present the evidence bears the burden of proof. Third, although a plaintiff is not required to call, during his or her case-in-chief, every conceivable witness who might contradict a potential defense witness, it is also generally true that

[a] party cannot, as a matter of right, offer in rebuttal evidence which was proper or should have been introduced in chief, even though it tends to contradict the adverse party's evidence and, while the court may in its discretion admit such evidence, it may and generally should decline to admit the evidence.

*Takayama*, 82 Hawai'i at 497, 923 P.2d at 914 (citations omitted).

*Nelson v. University of Hawai'i*, 97 Hawai'i 376, 384–85, 38 P.3d 95, 103–04 (2001) (internal quotation marks and some citations omitted). In order to determine whether, based upon the foregoing rules, the trial court abused its discretion in allowing rebuttal testimony, we examine the sequence of the trial. *Id.* at 384, 38 P.3d at 103 (citation omitted).

In its case-in-chief, the prosecution presented evidence that Duncan committed theft in the first degree. In his defense, Duncan testified that he did not know, initially, that

he was being enlisted in a criminal endeavor and that his continued participation was the result of coercion. McCoy's testimony that he advised Duncan to establish himself as the "village idiot" was admitted solely to attack Duncan's credibility. McCoy's testimony did not provide additional support for an affirmative position that the prosecution attempted to prove in its case-in-chief. Moreover, such testimony could not have been properly introduced until Duncan placed his credibility at issue by testifying in the manner that he did. Accordingly, we hold that the trial court did not err in allowing McCoy's testimony on rebuttal.

(b) *Staszyn's testimony*

█ The prosecution called Detective Staszyn for the purpose of introducing statements made by Duncan to Detective Staszyn on the day of his arrest that were inconsistent with his trial testimony. Duncan objected, arguing—outside the presence of the jury—that the prosecution's use of Duncan's prior inconsistent statements violated the requirements of HRE Rule 613. The prosecution asserted that Staszyn's testimony was admissible as an admission by a party opponent under HRE Rule 803. Duncan disagreed, arguing that Rule 803 would allow such testimony in the prosecution's case-in-chief, but not on rebuttal. The court overruled the objection and asked the prosecution to describe what part of Duncan's testimony would be discussed. The prosecution indicated that it would cover Duncan's statement that the smoke alarm interrupted his work the first night and the amount he was paid. Again, Duncan objected on the basis of HRE Rule 613. The court overruled the objection and allowed Staszyn to testify. Staszyn testified, in part, as follows:

Q. [By the prosecution] Okay. All I'm referring to, Detective, is the point in time where he was—did he discuss with you the fact that he began melting gold the night of the robbery in the hotel room?

A. [By Staszyn] Yes.

Q. Did he explain that a smoke alarm went off at one point?

A. Yes.

Q. What did he say happened after that?

A. He said he began melting the gold, and a smoke alarm went off. He didn't particularly say who, but he said they got the smoke alarm to stop. He then continued to melt all the items until the two bags were empty.

Q. So did he tell you about how right after the alarm went off, he packed up all of his tools and went home?

A. No, he didn't say that.

Q. Did he tell you about Norman Kaui making phone calls to him on his way home?

A. No, he didn't say that.

[DEFENSE COUNSEL]: Your Honor, could I note an objection. This seems to be beyond the scope of the rebuttal that we discussed.

THE COURT: Sustained.

Q. [By the prosecution] So let me get this straight. He told you after the alarm was [sic] went off and was disabled, he continued to melt the gold until the two bags were empty?

A. [By Staszyn] Yes.

Q. Did he ever mention coming back a second night?

[DEFENSE COUNSEL]: Same objection?

A. [By Staszyn] No.

THE COURT: Overruled.

Q. [By the prosecution] Did you ever— did you ask him how long it took him to melt the gold that night?

A. [By Staszyn] Yes.

Q. What was his answer?

A. Two hours.

Q. And for that time, did you ask him how much he was paid?

A. Yes.

Q. What did he say?

A. He said he was paid $500 and a bag of marijuana.

Q. Any mention of $300 two different times?

A. No.

■ As previously stated, Duncan claims that the prosecution failed to lay a proper foundation pursuant to HRE Rule 613 for Staszyn's testimony. HRE Rule 613(b) establishes the requirement for admitting extrinsic evidence of a prior inconsistent statement of a witness: "Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless, on direct or cross-examination, (1) the circumstances of the statement have been brought to the attention of the witness, and (2) the witness has been asked whether the witness made the statement." *See also State v. Eastman,* 81 Hawai'i 131, 137, 913 P.2d 57, 63 (1996). This court has explained that the "foundation requirement is for the purpose of rekindling the witness' memory, and substantial compliance is all that is necessary." *State v. Pokini,* 57 Haw. 26, 29, 548 P.2d 1402, 1405 (citing *Duncan v. State,* 166 Ind.App. 302, 335 N.E.2d 827 (1975)), *reh'g denied,* 57 Haw. 26, 548 P.2d 1402 (1976).

The prosecution concedes, and our examination of the record confirms, that it failed to comply with the requirements of HRE Rule 613(b). However, the prosecution argues that Staszyn's testimony was admissible under HRE Rule 803(a)(1) as an admission of a party opponent. We agree that Duncan's out-of-court declarations to which Staszyn testified constituted admissions by a party opponent, within the meaning of HRE Rule 803(a)(1), but disagree that, as a *per se* matter, they were admissible as rebuttal testimony without compliance with the mandate of HRE Rule 613. Staszyn's testimony constituted extrinsic evidence of Duncan's prior inconsistent statement that was offered specifically to impeach Duncan. Accordingly, compliance with HRE Rule 613 was necessary. Moreover, because the prosecution failed to lay a proper foundation pursuant to HRE Rule 613, the trial court erred in allowing the prosecution to impeach Duncan with Staszyn's testimony.

---

3. Duncan also contends that Staszyn's testimony constituted improper rebuttal evidence because it should have been introduced as part of the prosecution's case-in-chief. As with McCoy's testimony, discussed *supra:* Staszyn's testimony: (1) attacked Duncan's credibility; (2) did not pro-

■ The next question, then, is whether the admission of Staszyn's rebuttal testimony constitutes reversible error. We have noted that

error is not to be viewed in isolation and considered purely in the abstract. It must be examined in light of the entire proceedings and given the effect to which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction.

*State v. Heard,* 64 Haw. 193, 194, 638 P.2d 307, 308 (1981) (per curiam) (citations omitted). In the present case, Duncan's credibility was the linchpin of his defenses of duress and choice of evils. The prosecution's failure to comply with the foundational requirements of HRE Rule 613 deprived the defense of a fair opportunity to respond to Staszyn's testimony impeaching Duncan's credibility. Accordingly, there is a reasonable possibility that the erroneous admission of Staszyn's testimony contributed to Duncan's conviction.[3] Therefore, the error was not harmless.

### B. *Sufficiency of the Evidence*

#### 1. Standard of Review

■ The test on appeal regarding sufficiency of the evidence is whether there is substantial evidence to support the conclusion of the trier of fact. *See State v. Mattiello,* 90 Hawai'i 255, 259, 978 P.2d 693, 697 (1999). "Substantial evidence" is "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Id.* (brackets and citations omitted). Additionally, "evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction." *Id.* (citations and internal quotation marks omitted).

---

vide additional support for an affirmative position the prosecution attempted to prove in its case-in-chief; and (3) would not have been proper in the prosecution's case-in-chief. Therefore, we find no merit to this contention.

## 2. Analysis

After the prosecution rested, defense counsel moved for a judgment of acquittal, arguing that the prosecution presented insufficient evidence to support a conviction. The court denied the motion. On appeal, Duncan claims that the prosecution presented insufficient evidence to support his conviction of theft in the first degree. We disagree.

As noted *supra*, a claim regarding the sufficiency of the evidence requires this court to determine if the prosecution presented credible evidence of sufficient quality and probative value to enable a person of reasonable caution to support the determination of the trier of fact. Theft is defined by HRS § 708–830 (1993): "A person commits theft if the person does any of the following: (1) Obtains or exerts unauthorized control over property. A person obtains, or exerts control over, the property of another with intent to deprive the other of the property...." Specifically, a person commits the offense of theft in the first degree "if the person commits theft ... [o]f property or services, the value of which exceeds $20,000." HRS § 708–830.5 (1993). Thus, pursuant to HRS §§ 708–830(1) and 708–830.5(1)(a), the material elements of theft in the first degree are that the defendant intended to:

(1) obtain or exert control over the property of another;

(2) deprive the other of his or her property; and

(3) deprive another of property that exceeds $20,000 in value.

*See State v. Cabrera*, 90 Hawai'i 359, 367, 978 P.2d 797, 805 (1999). Accordingly, the issue in this case is whether, viewed in the light most favorable to the prosecution, credible evidence of sufficient quality and probative value was adduced to enable a person of reasonable caution to support the determinations that: (1) Duncan intentionally obtained or exerted control over the jewelry store's gold; (2) Duncan intentionally deprived the jewelry store of its gold; and (3) Duncan intentionally deprived the jewelry store of gold that exceeded $20,000 in value.

First, the testimony of Kaui and Duncan reveal that there was substantial evidence to prove that Duncan intentionally exerted control over the jewelry store's gold. Even after realizing that the jewelry was stolen, Duncan, nevertheless, proceeded to melt the gold.

Second, the testimony of Kaui and Duncan also shows that Duncan intentionally deprived the jewelry store of its gold. Not only did Duncan melt the gold and, thereby, further deprive the store of its jewelry, but he also failed to report the crime to the police, despite numerous opportunities.

Finally, the testimony of Kaui and Duncan provides substantial evidence that Duncan knew that the property of which he was intentionally depriving the jewelry store exceeded $20,000 in value. Although there is no evidence that Duncan himself took the price tags off the jewelry before melting the gold, he did testify that he "saw an enormous amount of jewelry laid out ... all bearing price tags." As noted *supra*, the jewelry's retail value was $1,403,841.94 and the wholesale value was $553,701.00, an amount vastly in excess of $20,000. The amount of stolen jewelry, coupled with Duncan's expertise as a goldsmith, which he learned as a teenager, constituted credible evidence that Duncan was aware that the gold's value exceeded $20,000. Thus, sufficient evidence was presented at trial to support the finding that Duncan committed theft in the first degree.

## III. *CONCLUSION*

For the reasons discussed above, we vacate Duncan's conviction of and sentence for first degree theft and remand for further proceedings consistent with this opinion.