STATE OF HAWAI`I, Plaintiff-Appellee-Respondent,
v.
OLIVIER CARLUT, Defendant-Appellant-Petitioner.
No. 27530
Supreme Court of Hawaii.
November 5, 2008.
Brandon L.K. Paredes, Deputy Prosecuting, Attorney, for the plaintiff-appellee-respondent State of Hawai`i
Hayden Aluli for the defendant-appellant-petitioner Olivier Carlut

MEMORANDUM OPINION

NOT FOR PUBLICATION
MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.
We accepted the defendant-appellant-petitioner Olivier Carlut's application for a writ of certiorari in order to review the summary disposition order of the Intermediate Court of Appeals (ICA) in State v. Carlut, No. 27530 (Hawai`i Ct. App. Jun. 6, 2008) (ICA's SDO). The ICA affirmed the September 2, 2005 judgment of conviction and probation sentence of the family court of the second circuit, the Honorable Richard T. Bissen, Jr., presiding, which convicted Carlut of the offense of abuse of family or household members, in violation of Hawai`i Revised Statutes (HRS) § 709-906 (Supp. 2002).[1] ICA's SDO at 1, 8. Carlut argues that the ICA gravely erred in concluding that the family court's erroneous evidentiary rulings were harmless beyond a reasonable doubt.
For the reasons that follow, we hold that the ICA erred in concluding that the family court's erroneous admission of a recording of the complainant's 911 call and a voluntary victim statement (VVS) form signed by the complainant was harmless beyond a reasonable doubt. We therefore vacate the ICA's July 3, 2008 judgment on appeal, vacate the family court's September 2, 2005 judgment of conviction and probation sentence, and remand this matter to the family court for a new trial.

I. BACKGROUND

A. Factual Background
From November 2004 through April 2005, Carlut and the complainant were engaged in a romantic relationship. The complainant moved in with Carlut in his three-bedroom house in Khei, Maui, from February to mid-March. She brought with her a bed and other items.
On April 15, 2005, the complainant was staying at Carlut's house on a temporary basis. At approximately 3:00 p.m., the complainant's son entered the house to sign a document. Carlut was arguing with the complainant because he did not approve of her son coming over to his house. The complainant left the residence, consumed a "couple" of beers, and returned to the residence two hours later. Upon arrival, she found Carlut sober and asleep. When he awoke, there was a confrontation, the facts of which were largely disputed at trial. The complainant's and Carlut's accounts were, however, consistent to the extent that they both testified that Carlut directed the complainant to leave the house, that he took her house key from her, and that he slapped her.
The events that followed the incident were not contested at trial. After the altercation, the complainant left the house. On her way out, she took Carlut's wallet because she wanted to retaliate against him for taking the key. Once outside, she walked to the house's garage. There, she called her son, who came to the residence and had a conversation with Carlut. Carlut told the complainant's son that he would not give the complainant a key to his residence. Thereafter, the complainant's son spoke with the complainant, and she decided to return Carlut's wallet in exchange for a check for the monies that she had contributed toward a vacation to France that she and Carlut had planned.
The complainant left Carlut's residence feeling upset because of how her relationship had unraveled. She did not want to call the police, but her son prevailed on her to report the incident. She placed the call between 5:00 and 6:00 p.m. and spoke with Maui Police Department (MPD) Officer William Heyde. MPD Officers Jamie Wright and Trinidad Alconcel were dispatched to Carlut's residence. By the time they arrived at the residence, it had been more than an hour since the altercation. The complainant met them there and related her account of the incident to Officer Wright, who filled out a VVS form for her. The complainant signed the form, but did not read it before signing. Officer Alconcel took photographs of her face and left arm to document her physical condition. He arrested Carlut shortly thereafter.

B. Pretrial
On April 29, 2005, the plaintiff-appellee-respondent State of Hawai`i (the prosecution) filed a complaint charging Carlut with the offense of abuse of family or household members, in violation of HRS § 709-906. The same day, the deputy prosecuting attorney (DPA) who was then assigned to the case, Donald S. Guzman, spoke with the complainant.
The case was later reassigned to another DPA, Timothy T. Tate. On July 27, 2005, Tate returned a telephone call to the complainant. During the call, the complainant recanted part of her original statements to the police. The same day, Tate called Carlut's counsel, Hayden Aluli, to disclose what the complainant had told him. According to Aluli, Tate said that the complainant had stated that her initial statements to the police were untrue, that she was very drunk and upset at Carlut during the April 15, 2005 incident, that the marks on her forearm were not caused by Carlut but by old mosquito bites, and that Carlut had not hurt her.
On August 9, 2005, Carlut filed a motion to compel discovery, requesting production of all of the complainant's statements that were inconsistent with her prior initial statements to the police and copies of all notes, memoranda, and reports relating to such statements that were in the prosecution's possession. On August 12, 2005, the prosecution filed a memorandum in opposition, asserting that any notes made by Tate in the course of speaking with the complainant were not subject to discovery. The family court, the Honorable Rhonda I.L. Loo presiding, heard the motion on the same day. It denied the motion because it believed that the prosecution had complied with its duty of disclosure.
Also on August 12, 2005, investigator Michael Greig conducted an interview with the complainant in which she gave a full statement regarding the facts and circumstances of the case. The complainant's statement was documented by Grieg in his investigative report, which was disclosed to Carlut the same day as the interview, August 12, 2005. The report indicated that, during the interview, the complainant explained that various statements she had made to the police were untrue. She said that she had lied when she stated that Carlut scratched her forearm because she had been upset with him. She could not remember whether Carlut pulled her hair, but she did recall that he grabbed her arm, twisted it, and bent it behind her back while trying to take her keys from her. She stated that Carlut had not struck her numerous times, as she had told the police, but instead only once on the left side of her face. The complainant recalled speaking with Tate over the phone on July 27, 2005. She remembered telling him that she had herself caused the scratch on her left arm by scratching a mosquito bite.
On August 8, 2005, Carlut filed his first amended proposed witness list and named Tate as a defense witness. On August 15, 2005, he filed a renewed motion to compel discovery. The same day, the prosecution moved to preclude Carlut from calling Tate as a witness on the basis that calling him would violate Hawai`i Rules of Professional Conduct Rule 3.7 and because he had already disclosed what he knew to Carlut. The prosecution also maintained that, in light of Greig's investigative report, other witnesses could be called in lieu of Tate.
At the hearing on the two motions, which was held the same day they were filed, August 15, 2005, the family court, the Honorable Richard T. Bissen, Jr., presiding, denied Carlut's renewed motion to compel discovery. With respect to the prosecution's motion to preclude him from calling Tate as a witness, the prosecution reiterated that other witnesses were available to impeach the complainant's credibility. It also explained that, if Tate were to testify regarding his conversation with the complainant, Aluli, Carlut's attorney, would become a witness as well, because the only person who could impeach Tate's statements to Aluli would be Aluli himself. Carlut countered that Tate was, in fact, a necessary witness, because, unlike when she spoke with Tate, the complainant did not disclose to Grieg that she was very drunk during the April 15, 2005 incident. The family court granted the prosecution's motion because it believed that Carlut had other witnesses who could be called to impeach the complainant's credibility.

C. Trial

1. The complainant's testimony
Trial commenced on August 29, 2005. After giving its opening statement, the prosecution called the complainant as its first witness. On direct examination, she testified that, when Carlut awoke from his nap on April 15, 2005, she told him that she was upset that he would not allow her son to enter the house while she was living there. Carlut did not respond. The complainant declared that she was leaving. Carlut similarly told her to leave, but, at that point, she changed her mind and no longer wanted to leave. Carlut took her house key from her, which prompted her to scream in frustration. Carlut responded by slapping her on the left side of her face with an open hand. The complainant testified that she never gave Carlut permission to slap her in the face. When asked about her VVS form, the complainant stated that she did not adopt the form as her statement and asserted her fifth-amendment right against self-incrimination. When asked whether the statements on the form were different from what she had related to the officer who prepared the form, the complainant again asserted her right against self-incrimination.
On cross-examination, Carlut's counsel, Aluli, asked the complainant whether she had lied to the police. In response, the complainant asserted her right against self-incrimination. Aluli also asked the complainant whether she previously had a conversation with the DPA, Tate, to which Tate objected on relevancy grounds. In a bench conference, the following discussion ensued amongst the family court, Tate, and Aluli:
THE COURT: Mr. Tate, I am going to allow some leeway with [the complainant]. Mr. Aluli has a good faith basis, as he has been saying throughout this case, to assert that there has been a conversation.
Now, Counsel, in the previous motions in limine, I ordered that Mr. Tate's statement was privileged. In fact, Judge Loo ordered or ruled on that. Remember that ruling? So I am asking you not to go into that area. Okay?
MR. ALULI: Well 
THE COURT: That's already been ruled on by the Court. Okay?
MR. ALULI: That I am not entitled to any work product?
THE COURT: Statement.
MR. ALULI: Recorded statements?
THE COURT: That is correct.
MR. ALULI: But I am entitled to get into the substance of the statements, because Mr. Tate already told me what this witness had told him. So 
THE COURT: Do not make yourself a witness, Mr. Aluli. Do not make yourself a witness. I will have to do this case all over again.
Because that was why we did the Motion in Limine, Counsel. You have other areas you can impeach this witness on.
Okay. And you are going after the investigator, at the police reports, now you are going to go after the person trying the case. I am just giving you fair warning to stay away from that area.
MR. ALULI: Well, Judge, I have raised the issue with my motion. I told the Court that I had subpoenaed 
THE COURT: I know. I ruled on that.
MR. ALULI: But, Judge, I think I am entitled with respect to any impeachment material to get before the jury. That's  Mr. Tate himself 
THE COURT: What are you going to use, your conversation with Mr. Tate?
MR. ALULI: Absolutely not.
THE COURT: What other  you didn't get any documents, so what else do you have?
MR. ALULI: I am using this witness'[s] conversation with Mr. Tate where she had admitted certain things were not true. And I want to believe the jury 
THE COURT: How are you going to impeach that, Counsel? That's my question.
MR. ALULI: I have a good faith basis to ask her that.
THE COURT: With what? What are you going to use[] to impeach her? You have the investigator's statement?
MR. ALULI: I am first, Judge 
THE COURT: Are you going to use Mr. Tate to impeach her?
MR. ALULI: I told you, Judge, that I am entitled to 
THE COURT: You will not call Mr. Tate[;] he will not be a witness in this case. I ruled on that earlier.
MR. ALULI: Your ruling, Judge, in my view, precludes effective cross-examination.
THE COURT: Maybe to you, Counsel. And that's a point to take up on appeal if this has to go that way. But you are not going to call him as a witness in this case.
MR. ALULI: All right, Judge.
THE COURT: Thank you.
After the bench conference, the family court did not rule on the prosecution's initial relevancy objection to Carlut's question whether the complainant had had a conversation with Tate. Instead, the family court informed Aluli that he could continue. Aluli responded by asking the court if it was time for a break. The family court explained that, because the trial had only been in session for less than fifty minutes, the court would recess after an hour. Again, the family court informed Aluli that he could continue, to which he responded that the defense had no further questions.

2. Testimony by Officers Heyde, Wright, and Alconcel
Following the complainant's testimony, the prosecution called Officer Heyde, the police dispatcher who spoke with the complainant during her 911 call on April 15, 2005. He identified State's Exhibit 2, a compact disk that contained an audio recording of the 911 call, and the prosecution offered the exhibit into evidence. Carlut objected on the ground that it contained hearsay statements that did not qualify as present sense impressions, excited utterances, or statements of existing mental, emotional, or physical condition. The family court responded that, even if the statements were not present sense impressions, they were excited utterances or statements of existing mental, emotional, or physical condition. Carlut additionally objected on the basis that he could not effectively cross-examine the complainant based on her statements. The family court countered that Carlut could confront the complainant if he wanted to. Consequently, the circuit court admitted the recording. In the recording, the complainant stated that Carlut had beaten her up. She explained that he had almost broken her arm, that he had slapped her two times on the ear, and that he had hit her on the head. She stated that her face was swollen. When asked whether she had hit back at Carlut, she answered: "No. I can't."
After Officer Heyde's testimony concluded, the prosecution called Officer Wright, one of the officers who responded to the complainant's 911 call on April 15, 2005. He testified that he asked the complainant if she wanted to fill out a VVS form, and she said that she did. She asked the officer to fill out the form for her because she was too shaken up and did not want to write it herself. Officer Wright therefore filled out the form for her outside of the residence on the trunk of his vehicle. During his testimony, the officer identified State's Exhibit 1, a copy of the VVS form that the complainant had signed. The prosecution offered the form into evidence, and Carlut objected on the grounds that it was not a prior inconsistent statement and that he did not have an opportunity to meaningfully cross-examine the complainant regarding her statements. The family court overruled Carlut's objections and admitted the form into evidence. The form stated that the complainant and Carlut had engaged in a "verbal argument." He slapped her many times on both sides of her face, pulled her hair, twisted and scratched her left arm, and kicked her out of the house after taking her keys. The complainant consequently sustained injuries to her face, the back of her head, and her arms.
In addition to discussing the VVS form, Officer Wright testified that his observations of the complainant's physical features on April 15, 2005 were consistent with what she had reported to him. He observed a small trail of blood on her left arm that looked like a scratch. She also had redness and swelling on the left side of her face in the shape of a hand print. She complained to Officer Wright that her injuries were painful. On cross-examination, the officer identified Defendant's Exhibits 2, 3, and 4, which were photographs of the complainant. The officer was asked whether the photographs accurately depicted the complainant's condition on April 15, 2005. He responded that Defendant's Exhibit 2, which depicted the complainant's left arm, showed a red spot on her arm, but that he recalled seeing blood where the red spot was. He also explained that the photographs of her face, Defendant's Exhibits 3 and 4, were inaccurate because, in person, her face was much redder. Carlut offered, and the circuit court admitted, the exhibits into evidence. Officer Wright additionally testified that he could smell alcohol on the complainant' breath when he spoke with her, but that there was no redness in her eyes. On redirect examination, the officer identified State's Exhibits 3, 4, and 5, which were enlarged versions of the photographs that the family court had just admitted. The officer explained that he could more clearly see a handprint, redness, and swelling on the complainant's face in State's Exhibit 3 than in Carlut's corresponding exhibit. The prosecution offered, and the family court admitted, the State's Exhibits 3, 4 and 5.
Officer Alconcel was called next to testify. He stated that, when he was dispatched on April 15, 2005 to respond to the complainant's 911 call, he observed that there was redness and swelling on the left side of the complainant's face and a cut on her left forearm. The complainant told him that Carlut had caused those injuries. The officer testified that he had taken the photographs that were previously admitted as State's Exhibits 3, 4, and 5. He explained that the redness, swelling, and finger markings depicted in the photograph were consistent with what the complainant had reported to him. On cross-examination, the officer testified that he could smell alcohol on the complainant's breath and that she admitted that she had been drinking. He could not recall whether her eyes were bloodshot, but he did remember that she did not need any help standing. Tr. 8/30/05 at 103.

3. Testimony by Carlut and Guzman
After the prosecution rested its case, Carlut gave his opening statement. He then called Officer Alconcel to testify for a second time. Following the officer's testimony, Carlut took the stand in his own behalf. He testified that the complainant had a history of violent behavior prior to the April 15, 2005 incident. She had a drinking problem and was on probation for assaulting her ex-husband and for drunk driving. One night, she came home at approximately 1:00 a.m., kicked Carlut out of bed, and yanked out the bed sheet. She pulled picture frames off the wall in the bedroom and threw them on the floor. She also threw her clothes and other belongings on the floor. Her conduct alarmed Carlut. He called the police because he was afraid for his safety, but declined to pursue charges because he knew that the complainant was still on probation and he felt sorry for her.
Carlut testified that the complainant was drunk when she came home on April 15, 2005; he could smell alcohol on her breath. He demanded that she return his house key and that she vacate the premises because he believed that she would "get crazy." The complainant became hostile and refused to return the key or leave. Carlut walked up to her and said, "[G]ive me back my key, give me back my key, get out." The complainant again refused to return the key. She proceeded to push Carlut, saying, "[N]o, you don't get the key, no." Carlut did not authorize or consent to her pushing him. He responded by slapping her once with his right hand so that he could take back the key. He grabbed her right wrist with his left hand and took the key from her hand. Carlut testified that he took the key because he was concerned for his safety.
Guzman, the DPA who was initially assigned to the case, testified next. He stated that he took notes regarding his April 29, 2005 conversation with the complainant. The notes reflected that the complainant had stated that she wanted to withdraw the prosecution and that the markings on her arm were caused by mosquito bites.

4. Jury instructions, the prosecution's closing argument, and the family court's judgment
After the defense rested its case, the family court instructed the jury regarding, among other things, Carlut's defenses of use of force for the protection of property, use of force in self-protection, and consent. During closing argument, the prosecution discussed the 911 recording and the VVS form, asserting that:
When I gave my opening statement, I told you what I expected the evidence to show in this case. And you heard on the 911 call that was admitted into evidence, so you will be able to take it in the back and listen to it again if you need to do that. And what you are able to observe on the victim voluntary statement form submitted to the police that night was consistent with what I said the evidence would show.
The prosecution further maintained that:
This was not about a drunk and belligerent woman on a rampage. There was no evidence of that. You heard the 911 call yourselves. You will be able to listen to it again when you deliberate. And you heard her speak in court. Listen to the 911 call. It will be obvious that she is not speaking with slurred speech. She is able to  or broken speech. She is able to communicate with the operator, answer questions, give information and communicate about what happened to her in particular that he had abused her.
. . . [A]lthough she had admitted to having been drinking, . . . there was no evidence that she was drunk and impaired. Both of the officers testified to that. They both communicated with her. After the 911 call dispatched them to the location, both had a chance to observe her and talk with her.
In fact, Officer Wright said he stood up with her by the car, the trunk of the car, and helped her fill out the form, but she was so shaken, he did it for her, and then he wrote down what she reported to him.
She reviewed the form and signed it at that time adopting it as her signature [sic]. And she testified that she  that is her signature and she remembered signing it. The only thing she backed off on saying was[, "]I didn't really look at it when I signed it.["] But it's curious because what is on the form, the officer didn't add anything there, because  other than what she told him, because it's consistent with what was on the 911 call.
The officer was not involved in the 911 call. What she reported to the operator, you will see by looking at the victim voluntary statement, is exactly what she reported to the police later. Th[ose were] her words. She reported the fact[s] as they occurred that night.
Following its deliberations, the jury found Carlut guilty as charged. On September 2, 2005, the family court entered its judgment of conviction and probation sentence, sentencing Carlut to, among other things, forty-eight hours of incarceration, with credit for time served, and one year of probation. Carlut filed a timely notice of appeal on September 30, 2005.

D. Appellate Proceedings
Carlut raised three points of error that are pertinent here, the first of which was that the family court erred in admitting the 911 recording, because it contained inadmissible hearsay statements that did not qualify as present sense impressions, excited utterances, or statements of existing mental, emotional, or physical condition pursuant to Hawai`i Rules of Evidence (HRE) Rule 803(b)(1), (2), and (3), respectively. The prosecution did not assert that the statements qualified as either present sense impressions or statements of existing mental, emotional, or physical condition. It instead maintained that the statements were admissible as excited utterances. The ICA held that the complainant's statements in the recording were hearsay and that they did not fall within the excited utterance exception set forth in HRE Rule 803(b)(2). ICA's SDO at 3-4. The ICA reasoned that, given the limited nature of the complainant's injures, the time lapse between the incident and the complainant's recorded statements, and the fact that the complainant had discussed the incident with her son before calling the police, her statements did not constitute admissible excited utterances. Id. at 4.
Next, Carlut posited that the family court committed error by admitting the complainant's statement in the VVS form as a prior inconsistent statement. The prosecution conceded this point, but asserted that the family court's error was harmless because the statement constituted an excited utterance. The ICA concluded that the statement did not qualify as an excited utterance for the same reasons that it determined that the complainant's statements memorialized in the 911 recording were not excited utterances. Id. at 5.
Carlut's final argument was that the admission of the 911 recording and the VVS form violated his constitutional rights of confrontation. He additionally posited that his confrontation rights were offended when the family court precluding him from cross-examining the complainant regarding certain statements that she allegedly made to the DPA, Tate. The ICA assumed for the sake of argument that Carlut's confrontation rights had been violated and turned its attention to whether the family court's errors were harmless beyond a reasonable doubt. Id. at 5-6, 8.
Carlut argued that the admission of the 911 recording and the complainant's written statement was not harmless, because the jury relied upon those exhibits to corroborate and bolster the reliability of the statements that she made directly to the investigating police officers. He also asserted that, had he been permitted to cross-examine the complainant regarding certain statements that she allegedly made to Tate, he could have undermined the complainant's credibility. Apparently addressing Carlut's second point, the ICA concluded that he had numerous opportunities to undermine the complainant's credibility regarding her statements to the police by eliciting the complainant's testimony that she had been drinking on the night of the incident and that she had recanted portions of her statement to the police when she was interviewed by investigator Greig. Id. at 8. It emphasized that Carlut had, in fact, elicited testimony from Guzman that the complainant had recanted portions of her prior statement to the police. Id.
The ICA additionally discussed the basic elements of the offense of abuse of family or household members and the evidence adduced at trial. It explained that, "[t]o support a conviction of abuse of family or household members, the prosecution was required to prove that Carlut: (1) intentionally, knowingly, or recklessly, (2) physically abused, i.e., maltreated or injured, hurt or damaged, (3) a family or household member." Id. at 7 (citing State v. Machado, 109 Hawai`i 445, 453, 127 P.3d 941, 949 (2006)). The ICA reasoned that the family court's errors were harmless because, even without the 911 recording and the VVS form and even if it was error to limit further cross-examination of the complainant on her statements to Tate, there was overwhelming and compelling evidence that Carlut had intentionally, knowingly, or recklessly physically abused a family or household member, in violation of HRS § 709-906(1). Id. at 8. It observed that:
[The complainant] had been living with Carlut for almost two months when the incident took place. Carlut, as well as [the complainant], testified at trial that Carlut slapped her with his right arm. Although [the complainant] could not remember at trial whether the slap was painful, both responding officers testified that they observed physical injuries to [the complainant's] face, and one of the officers testified that [the complainant] complained of pain as a result of her injuries. One of the officers testified at trial that he observed redness and swelling to the left side of [the complainant's] face and took three photographs, which were admitted into evidence at trial. [The complainant] testified, inter alia, that Carlut was the one who had caused her injuries.
Id. at 7-8.
The ICA affirmed the family court's judgment of conviction and probation sentence, id., and entered its judgment on appeal on July 3, 2008. Carlut filed a timely application for a writ of certiorari on October 1, 2008, and we accepted the application on October 23, 2008.

II. STANDARDS OF REVIEW

A. Certiorari
The acceptance or rejection of an application for a writ of certiorari is discretionary. HRS § 602-59(a) (Supp. 2007). In deciding whether to accept the application, this court considers whether the ICA's decision reflects "(1) [g]rave errors of law or of fact[] or (2) [o]bvious inconsistencies . . . with [decisions] of th[is] court, federal decisions, or [the ICA's] own decision[s]" and whether "the magnitude of those errors or inconsistencies dictat[es] the need for further appeal." Id. § 602-59(b).

B. Harmless Error
"'In applying the harmless-beyond-a-reasonable-doubt standard, the court is required to examine the record and determine whether there is a reasonable possibility that the error complained of might have contributed to the conviction.'" State v. Peseti, 101 Hawai`i 172, 178, 65 P.3d 119, 125 (2003) (quoting State v. Balisbisana, 83 Hawai`i 109, 113-14, 924 P.2d 1215, 1219-20 (1996)) (brackets omitted).

III. DISCUSSION
Carlut's contends that the ICA erred in holding that, although the family court erred in admitting the 911 recording and the VVS form and even if it also erred in precluding Carlut from confronting the complainant regarding her statements to Tate, the family court's errors were harmless beyond a reasonable doubt, ICA's SDO at 8.

A. The Family Court Did Not Preclude Carlut From Cross-examining The Complainant Regarding Her Statements To Tate.
Before addressing whether the family court's errors were harmless, we will first consider whether the family court erred in precluding Carlut from confronting the complainant regarding her statements to Tate, a ruling that the ICA assumed was erroneous for the sake of argument, id. at 5-8. In his opening brief, Carlut argued that the circuit court precluded him from effectively cross-examining the complainant regarding certain statements that she allegedly made to Tate. According to Carlut, the family court ordered him not to pursue a line of questioning regarding the complainant's conversation with Tate, which would have shown that she had admitted to Tate that she had provided false statements to the police. In its answering brief, the prosecution countered that the family court only precluded Carlut from asking questions regarding Tate's statements, not the complainant's statements. In his reply brief, Carlut insisted that the circuit court precluded him from questioning the complainant regarding her own statements, and not simply Tate's statements. Thus, the parties' disagreement turns on the precise nature of the family court's ruling.
The ruling was made in the context of Carlut's cross-examination of the complainant. He asked the complainant whether she had had a conversation with Tate, and the prosecution objected on relevancy grounds. During the bench conference that followed, the family court informed Tate that it would allow Aluli "some leeway" with the complainant and that Aluli had a good faith basis to assert that there had been a conversation between Tate and the complainant. At the same time, the family court reaffirmed its previous ruling that Tate's recorded statements  his notes from his conversation with the complainant  were privileged. Consequently, the family court directed Aluli not to inquire into Tate's statements. Aluli replied that he was entitled to explore "the substance of the statements," because Tate had already told him what the witness had told Tate. The family court queried as to the manner in which Aluli intended to impeach the complainant. When Aluli provided unresponsive answers, the following exchange ensued:
THE COURT: Are you going to use Mr. Tate to impeach her?
MR. ALULI: I told you, Judge, that I am entitled to 
THE COURT: You will not call Mr. Tate[;] he will not be a witness in this case. I ruled on that earlier.
MR. ALULI: Your ruling, Judge, in my view, precludes effective cross-examination.
THE COURT: Maybe to you, Counsel. And that's a point to take up on appeal if this has to go that way. But you are not going to call him as a witness in this case.
MR. ALULI: All right, Judge.
THE COURT: Thank you.
To recapitulate, the family court ruled that Carlut could not call Tate as a witness and that Carlut could not ask the complainant questions regarding Tate's statements to her during their conversation. We agree with the prosecution that the family court did not preclude Carlut from inquiring into the statements that the complainant may have made to Tate. Accordingly, we do not believe that Carlut has shown that the family court erroneously precluded him from cross-examining the complainant regarding her statements to Tate. Thus, the ICA did not err in concluding that, even if the family court erred in precluding Carlut from cross-examining the complainant, the error was harmless. See id. at 8. The family court did not, in our view, err in the first instance.

B. The ICA Erred In Concluding That The Family Court's Erroneous Admission Of The 911 Recording And The VVS Form Was Harmless Beyond A Reasonable Doubt.
The residual question is whether the ICA erred in concluding that the family court's erroneous admission of the 911 recording and the VVS form was harmless beyond a reasonable doubt. See id. at 4-5. "Where there is a wealth of overwhelming and compelling evidence tending to show the defendant guilty beyond a reasonable doubt, errors in the admission or exclusion of evidence are deemed harmless." State v. Rivera, 62 Haw. 120, 128, 612 P.2d 526, 532 (1980); see also State v. Malufau, 80 Hawai`i 126, 131, 906 P.2d 612, 617, vacated in part on other grounds on reconsideration, 80 Hawai`i 126, 906 P.2d 612 (1995). In such a case, there is no reasonable possibility that the errors complained of might have contributed to the conviction. Cf. Peseti, 101 Hawai`i at 178, 65 P.3d at 125. Carlut does not appear to dispute that there was overwhelming and compelling evidence with respect to the basic elements of the offense of abuse of family or household members. His argument is instead that there was a reasonable possibility that the family court's erroneous admission of the 911 recording and the VVS form contributed to his conviction by undermining his defenses of use of force in the protection of property and use of force in self-protection.
Regarding the first defense, the family court instructed the jury that:
The use of force upon or toward another person is justified when the actor reasonably believes that such force is immediately necessary, one, to prevent the commission of criminal trespass or burglary in a building or upon real property in the actor's possession . . .; two, to prevent unlawful entry upon real property in the actor's possession . . .; three, to prevent theft, criminal mischief, or any trespassory taking of tangible, movable property in the actor's possession . . . .
The actor may[,] in the circumstances described above, use such force as the actor believes is necessary to protect the threatened property, provided that the actor first requests the person against whom force is used to desist from the person's interference with the property, unless the actor believes that, A, such a request would be useless; B, it would be dangerous to the defendant or another person to make the request; or, C, substantial harm would be done to the physical condition of the property which is sought to be protected before the request could effectively be made.
See also HRS § 703-306 (1993). As to the second defense, the family court instructed the jury that:
The use of force upon or toward another person is justified when a person reasonably believes that such force is immediately necessary to protect himself on the present occasion against the use of unlawful force by the other person. . . . Unlawful force means force which is used without the consent of the person against whom it is directed and the use of which would constitute an unjustifiable use of force.
(Spacing altered.) See also HRS § 703-304 (1993). With respect to both defenses, the family court instructed the jury that the reasonableness of the defendant's belief that the use of protective force was immediately necessary must be determined from the viewpoint of a reasonable person in the defendant's position under the circumstances that the defendant was aware of or as the defendant reasonably believed them to be. The family court also instructed the jury that, for purposes of the defenses, "force" meant any bodily impact, restraint or confinement, or the threat thereof.
Carlut raised his defenses of use of force in the protection of property and use of force in self-protection during his testimony. He explained that the complainant had a history of violent behavior, especially when she became intoxicated. He could smell the alcohol on her breath during the April 15, 2005 incident and he therefore believed that she was drunk. Concerned for his safety, he asked her to leave his residence and to return his house key. She grew hostile and refused. Carlut asked her again, but this time the complainant responded by pushing him, which prompted him to slap her in the face. At that point, he took the key, and she exited the house, grabbing his wallet on the way out. In contrast to Carlut's account, the complainant's testimony was that, during the incident, Carlut took the key from her, she screamed out of frustration, and then he slapped her in the face. She did not acknowledge pushing him before he slapped her. Nor did she acknowledge being intoxicated, though she did admit to consuming a "couple" of beers before the encounter. Thus, the questions whether the complainant was drunk during the incident and whether she was pushing Carlut before he slapped her were eminently germane to the jury's determinations as to whether Carlut's use of force against the complainant was "immediately necessary." See HRS §§ 703-304(1) and 703-306(1).
In deciding that question, the jurors were allowed to consider the 911 recording and the VVS form, neither of which mentioned that the complainant was pushing Carlut before he slapped her. In fact, the 911 recording suggested just the opposite. When Officer Heyde asked the complainant whether she had hit Carlut back, the complainant replied: "No. I can't." While that statement addressed the complainant's conduct after Carlut's alleged use of force, it also suggested, more generally, that the complainant was not acting aggressively toward Carlut before he slapped her. Furthermore, the 911 recording indicated that the complainant was not intoxicated during the incident, because, as the prosecution pointed out during its closing argument, she did not slur her speech when she spoke with Officer Heyde. In a nutshell, the 911 recording and the VVS form tended to reflect that the complainant was not drunk during the incident and that she did not push Carlut before he slapped her. As such, the evidence showed that Carlut's use of force against the complainant was not "immediately necessary." See HRS §§ 703-304(1) and 703-306(1). It thereby undermined his defenses of use of force in the protection of property and use of force in self-protection.
There is thus a reasonable possibility that the admission of the 911 recording and the VVS form might have contributed to Carlut's conviction. Cf. State v. Duncan, 101 Hawai`i 269, 278, 67 P.3d 768, 777 (2003) (holding that there was a reasonable possibility that the erroneous admission of a statement impeaching the defendant's credibility contributed to his conviction, because the statement undermined the defendant's credibility and his credibility was the linchpin of his defenses of duress and choice of evils). Its potential effect on his case was enhanced when the prosecution relied on the evidence during its closing argument. See State v. McCrory, 104 Hawai`i 203, 212, 87 P.3d 275, 284 (2004) (concluding that the potential harm of erroneously admitted evidence was enhanced by the prosecution's closing argument, wherein it referred to the evidence). Accordingly, we hold that the family court's erroneous admission of the 911 recording and the VVS form was not harmless beyond a reasonable doubt. See Peseti, 101 Hawai`i at 178, 65 P.3d at 125.[2]

IV. CONCLUSION
In light of the foregoing, we vacate the ICA's July 3, 2008 judgment on appeal, vacate the family court's September 2, 2005 judgment of conviction and probation sentence, and remand this matter to the family court for a new trial.
NOTES
[1] HRS § 709-906, entitled "Abuse of family or household members; penalty," provides in relevant part that: "It shall be unlawful for any person, singly or in concert, to physically abuse a family or household member . . . ." HRS § 709-906(1).
[2] Carlut also contends that the admission of the 911 recording and the VVS form undermined his defense of consent. We need not reach that argument in light of our conclusion that the erroneous admission of the evidence was sufficiently harmful to his defenses of use of force in the protection of property and use of force in self-protection.