*** FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER ***

Electronically Filed
Supreme Court
SCWC-12-0000109
22-DEC-2017
07:59 AM

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

_____

STATE OF HAWAIʻI,
Respondent/Plaintiff-Appellee.

vs.

PETER DAVID,
Petitioner/Defendant-Appellant.

_____

SCWC-12-0000109

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-12-0000109; CR. NO. 11-1-0050)

DECEMBER 22, 2017

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY WILSON, J.

## I.  INTRODUCTION

Peter David (David) was charged with murder in the second degree of Santhony Albert (Albert) and assault in the second degree of Torokas Kikku (Kikku).  At trial before the

Circuit Court of the First Circuit (circuit court),[1] David claimed that he acted in self-defense. The jury found him guilty of the lesser included offenses of manslaughter and assault in the third degree.

We consider only one issue on certiorari review: whether the Intermediate Court of Appeals (ICA) gravely erred in holding that the trial court did not abuse its discretion by allowing the State of Hawaiʻi to present testimony in rebuttal that went beyond the limited scope permitted by the trial court and introduced evidence of David's uncooperative behavior with the police.[2]

We hold that the State's rebuttal testimony was improper because it exceeded the limited scope of testimony permitted by the court, and the introduction of the improper rebuttal testimony was not harmless error. Accordingly, we vacate the ICA's judgment on appeal and the circuit court's judgment of conviction and sentence, and remand for a new trial on both offenses.

---

[1]     The Honorable Randal K.O. Lee presided.

[2]     We do not reach David's second issue, whether the ICA gravely erred in remanding David's case for resentencing rather than for a new trial given the misconduct of the prosecutor during sentencing, because we hold that the first error already necessitates remand for a new trial. Likewise, we also decline to analyze the alleged prosecutorial misconduct during the State's closing argument for plain error as requested in David's application for certiorari.

## II.   BACKGROUND

The undisputed evidence established that on the night of January 1, 2011, David and his cousin, Albert, were involved in a fight outside an apartment on Awanei Street in Waipahu that ended with David fatally stabbing Albert.  After David stabbed Albert, Albert's aunt, Torokas Kikku (Kikku), confronted David.  Kikku sustained minor injuries as a result of the confrontation.  The primary disputed issues at trial were whether David or Albert was the aggressor, and whether David acted in self-defense.

### A.    Trial Court Proceedings

On January 12, 2011, the State filed a complaint in the circuit court charging David with murder in the second degree of Albert, in violation of Hawaiʻi Revised Statutes (HRS) §§ 707-701.5[3] and 706-656.[4]  The State also charged David with

---

[3]    HRS § 707-701.5 (1993) provides, in relevant part:

     (1) . . . a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.

     (2) Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706-656.

[4]    HRS § 706-656(2) (Supp. 2010) provides, in relevant part:  ". . . persons convicted of second degree murder and attempted second degree murder shall be sentenced to life imprisonment with possibility of parole."

assault in the second degree of Kikku, in violation of HRS §
707-711(1).[5]  David's jury trial began on September 26, 2011.

### 1. The State's Case-in-Chief

The State called eight witnesses in its case-in-chief,
including Kikku.  Kikku described David as the aggressor in the
confrontation between David and Albert.  According to Kikku, she
attended a party in Kalihi on January 1, 2011 with her husband
Erick Sam (Sam), at which both Albert and David were present.
Kikku testified that she did not drink, but the men (including
David, Sam, and Albert) were drinking beer and vodka.  After an
argument broke out at the party, Albert, Kikku, Sam, and a few
others left the Kalihi house in Albert's car and went to Kikku's
Awanei Street apartment in Waipahu.  Kikku testified that before
they left Kalihi, David told Albert to give him the beer in
Albert's car; in response, Albert offered David one beer.  David

---

[5]     HRS § 707-711(1) (Supp. 2010) provides, in relevant parts:

    (1) A person commits the offense of assault in
    the second degree if:

        (a) The person intentionally or knowingly
            causes substantial bodily injury to
            another;

        (b) The person recklessly causes serious or
            substantial bodily injury to another;

        . . . .

        (d) The person intentionally or knowingly causes bodily
            injury to another with a dangerous instrument . . . .

4

rejected Albert's offer and demanded all of the beer.  Kikku testified that after Albert offered David the one beer, Kikku, Sam, and Albert departed for the Awanei Street apartment.  At around 8:00 p.m., Kikku, Sam, Albert, and the others in Albert's car arrived at the Awanei Street apartment.  The men started drinking, and about thirty minutes later, David arrived.  Kikku testified that she did not invite David into the apartment, but told Sam that David was there.  Sam went outside and told David not to come in, but David entered anyway.

Once inside the apartment, David began drinking beer with Albert and Sam.  Some time afterwards, Kikku heard the police come to her apartment and knock on the door.[6]  Kikku testified that while the police were at the door on the lanai, David and Albert were in the parking lot downstairs.  Kikku did not know whether the police talked to David and Albert, but after the police left, David and Albert came back upstairs.

When David and Albert came back into the apartment, Kikku noticed a scratch on David's nose that was not bleeding but looked "fresh."  In regard to the scratch on David's nose, David told Albert "how come you do this to me, no man can do this to me," and he looked angry.  Immediately after this

_____

[6]  Kikku would later clarify that the police were called to the apartment by a neighbor.

exchange, David went outside and told Albert to go with him.

Kikku held Albert's hand to stop him from going downstairs, and

told him not to go, but Albert followed David outside.  Within

the next ten seconds, Kikku followed Albert out of her apartment

where she went outside and saw David chase and hit Albert in the

back of the head.  Kikku did not know whether David had anything

in his hand when she saw him hit Albert.

Kikku followed David and Albert, and after turning a

corner she saw Albert bending over with his torso parallel to

the ground.  Kikku went over to Albert to help him back to her

apartment.  She did not realize he was bleeding or hurt at the

time.

Kikku tried to walk Albert toward the apartment, but

Albert had trouble walking.  Kikku then saw David return with a

rock in each hand, raised slightly above his shoulders.  Kikku

ran over to David and pushed him, trying to block him from

Albert, and David pushed her back with the rocks, causing

scratching under Kikku's arm and under her chin.

Kikku let go of David after he pushed her with the

rocks.  At that point, she saw David run over to Albert, who was

now laying face-up on the ground.  David straddled Albert and it

appeared to Kikku that David was going to throw the rocks onto

Albert.  When Kikku began screaming, David looked up, threw the

rocks away, and ran away. Kikku and another person at the apartment carried Albert upstairs. The paramedics arrived and attempted CPR, and at this time Kikku realized that Albert was bleeding and had been stabbed. Albert was taken to the Hawaiʻi Medical Center West where he died at approximately 1:31 a.m. from a stab wound that punctured his heart.

### 2.    The Defense's Case

After the prosecution rested its case, the defense called David as a witness. David's primary defense was that he acted in self-defense. In his testimony, he disputed Kikku's account. He contended that he was invited into Kikku and Sam's Awanei Street apartment and that Albert was the aggressor in the fatal confrontation.

David testified that, prior to the confrontation at the Awanei Street apartment, on the evening of January 1, 2011, he attended a party at a relative's house in Kalihi. At the party, Albert approached him and said, "why are you looking at me, you want me to beat you up." David did not respond. David testified that after the threat from Albert, he left the apartment in Kalihi, and received a ride to Kikku and Sam's Awanei Street apartment in Waipahu. David denied Sam told him not to come inside to the party. He maintained that Sam never told him to go home. He recalled that just before the police

7

arrived at the apartment, he was on the balcony and Albert was inside the apartment.  When the police arrived, both David and Albert went downstairs.  David testified that he did not speak with the police when they came to the Awanei Street address.

After the police left, David and Albert went back upstairs and sat at the table in the living room.  At that time, David told Albert to give him a beer, but according to David, Albert instead punched him and struck his nose with a beer bottle.  Albert told David "see, I can — I can beat you up," and David felt scared.  Albert then challenged David to follow him downstairs to the parking lot for a fight.[7]  David remained sitting for a brief period, but eventually went downstairs because Albert was calling him to come down to the parking lot, and David wanted "to tell [Albert] and beg him not to do that to me anymore."

David testified that after he went downstairs to the parking lot, he was walking between two parked cars, when Albert started kicking and punching him.  David fell down and Albert

---

[7]     Both David's and Kikku's testimony suggest that shortly after the police left, David and Albert went downstairs to fight.  Arlynn Ewen Moses testified, however, that after the police left, David and Albert sat together, during which time she was able to go to the store and return. Officer Randall Woo (Officer Woo) testified that he responded to the call that initially brought him to the Awanei Street apartment at 11:20 p.m.  He further testified that he returned to the same address an hour-and-a-half later after David and Albert had their confrontation.

continued kicking him. While David was on the ground and Albert was kicking him, David got "something" in his hand, and swung at Albert with it. After that, David stood up and Albert stopped attacking him, backed off a little, and then he ran. David ran after Albert because he was "getting mad" at him. After he stopped and rested, David realized that Albert had injured him.[8] For this reason, he became "really mad," picked up two rocks, and walked back towards Kikku and Albert.

Kikku struggled to take the rocks from David, but David overpowered her. David then walked away from Kikku and was "going to throw the rocks at [Albert]," but when he approached Albert and saw him lying on the ground, he threw the rocks away. David then walked away; he did not at that time think Albert was dead.

### 3. Recess in the Defense's Case and Bench Conference

During a recess in David's testimony between direct and cross-examination, the State informed the court of its intent to call (1) Officer Woo as a rebuttal witness to show that David falsely testified he had not spoken to the police, and (2) Sam to show David falsely testified he was invited to the party inside the Awanei Street apartment. With respect to

---

[8] David's testimony does not reflect what kind of injury he claims to have suffered.

Officer Woo, the prosecutor stated that he "ha[d] been trying to reach one of [his] witnesses that [he] was not able to put on in [the] case-in-chief. . . . [I]t's Officer Randall Woo, who [he] was] still trying to contact."  When asked by the court for an offer of proof as to the testimony of Officer Woo, the prosecutor stated, "Officer Woo is the officer who responded to the original call or complaint that there were males making noise.  He responded at about 11:30 to the Awanei Street address and spoke to both [Albert] and the defendant, which is contrary to what the defendant has testified to."  To further challenge David's credibility, the State sought to offer Sam's testimony that David was never invited to his apartment.

The defense objected to both rebuttal witnesses, arguing that, pursuant to State v. Duncan, 101 Hawai'i 269, 276 67 P.3d 768, 775 (2003), the State should have presented the evidence from Officer Woo and Sam in its case-in-chief.  The defense argued that under Duncan, the State was bound to give all available evidence in support of the charges against David in its case-in-chief, and was not permitted to withhold Officer Woo's testimony until rebuttal.  Duncan, 101 Hawai'i at 276, 67 P.3d at 775.  The State countered that it was unaware David would deny speaking to the police and that Officer Woo's testimony only became relevant to David's credibility once David

10

surprised the prosecution by claiming during his direct testimony he had not spoken to the police. The defense raised the issue that in the police report the State relied upon for its theory of admissibility, "nowhere does Officer Woo identify Mr. David or Mr. Albert as the specific person he talked to."

The court allowed the State to present its two rebuttal witnesses for "the limited purpose" of establishing whether David was invited to the Awanei Street apartment and whether David or Albert spoke to the police.

### 4.    The State's Cross-Examination of David

At the conclusion of the bench conference at which the court acceded to the State's request to call two rebuttal witnesses, the State began cross-examination of David. During its examination, the State focused on David's testimony that he had not spoken to the police:

> Q:    Now, you testified last week that when the police come you did not talk to the police; correct?
> A:    No.
> Q:    Not at all?
> A:    No.
> Q:    Did the police officer come and tell you that you needed to leave the area?
> A:    No.
> . . . .
> Q:    So it's your testimony that you did not speak to any police officer that night when they came over; correct?
> A:    Yes, I didn't talk to them.
> Q:    And no police officer asked you to leave the area, is that what you're telling us?
> A:    No.

The prosecutor also asked David how he was wearing his hair on the night of the incident. David testified that his hair was "not as long" but that it was tied back with a rubber band. In answer to the prosecutor's questioning, he stated that Albert had very short hair.

### 5. The Rebuttal Testimony of Officer Woo

Officer Woo took the stand to rebut David's testimony that neither David nor Albert spoke to the police on the night of the incident. Officer Woo stated that he arrived at the Awanei Street apartment at approximately 11:30 p.m. on the evening of January 1, 2011 in response to a "suspicious circumstance" call from a female at the same address. Upon arrival, he spoke to the female who called him. Officer Woo also testified that he spoke to two other people at the Awanei Street apartment:

> A:    Other than the caller, I spoke with two males who were in the area.
> Q:    In which area were you talking about? When you say in the area, could you be more specific?
> . . . .
> Q:    Okay, the record indicate he's indicating the parking lot fronting 84 or 94-832 Awanei Street.
>       Now, you spoke with – so did you speak with those males?
> A:    Yes.
> Q:    And could you describe them, give a description of each of the two males?
> A:    <u>Only one male stood out in particular that night, it was a Micronesian male with a ponytail.</u>
> Q:    You didn't know his name at the time?
> A:    No, I did not.

(Emphasis added.) Officer Woo did not describe the other male.

12

After Officer Woo testified that he spoke with "a Micronesian male with a ponytail," he continued his testimony by focusing on the male's (David's)[9] uncooperative behavior.  When Officer Woo was asked what he told "that particular Micronesian male," the officer testified that David was uncooperative and repeatedly refused the orders of Officer Woo to leave the scene:

> A:    The female wanted them to leave.  And I just related to both males that they didn't live here, they needed to leave.  They need to get out of the area.  Go home or go to another friend's house or somewhere else other than there.
> Q:    Now, the one with the ponytail, did he leave immediately?
> A:    Not immediately, but he left.
> Q:    Okay.  What do you mean by not immediately?
> A:    Most times when we tell people they need to leave they'll just turnaround [sic], walk away.

In response to the testimony describing David's uncooperative behavior, the defense objected based upon speculation and improper bolstering.  The court overruled the objection.  Officer Woo thus continued his response regarding David's uncooperative conduct in refusing to leave the area:

> A:    Most time people will turnaround [sic] and say, okay, we're leaving and they start to walk away.  This gentleman stayed in the parking lot and I told him one or two more times that he needed to go.
> . . . .

---

[9]    Officer Woo described the man as a "Micronesian male with a ponytail."  The prosecutor had earlier elicited testimony from David that his hair was tied back in a ponytail on the night of the incident, and that he was in the parking lot area while the police were at the Awanei Street apartment.

> A:    <u>My main concern was the individual with the ponytail because I had to tell him more than once to leave.</u>

(Emphasis added.)  The defense again objected, this time based on Hawaiʻi Rules of Evidence (HRE) Rule 404(b)(1994)[10]:

> DEFENSE COUNSEL:  I'm going to object, Your Honor.  This is 404(b) actually at this point.

Again, the court overruled defense counsel's objection. After the objection was overruled, Officer Woo testified that he had to tell David to leave possibly up to four times and that David remained uncooperative:

> Q:    Continue on, you had to what?
> A:    Tell him more than once to leave.
> Q:    How many times did you ask him to leave?
> A:    <u>I can't remember the exact number, maybe about two or three or maybe even four, I'm not too sure.</u>
> Q:    So what happened -- the first time you asked him to leave, did he walk the direction that you told him to the stop sign?
> A:    No, the first time I asked him to leave he was in the parking lot area.  So then I asked him to leave, he didn't.  So then I walked to the parking lot area, got closer to the male and then I told him to leave.

---

[10]    HRE Rule 404 (b) provides:

> (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident.  In criminal cases, the proponent of evidence to be offered under this subsection shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the date, location, and general nature of any such evidence it intends to introduce at trial.

> Q:    So you asked him once and he didn't move, okay.
> Did he appear to understand what you were telling him?  How
> did you tell him?
>         A:    I told him, oh, she doesn't want you here.  You
> guys need to leave.  You don't live here, you guys need to
> leave.
>         Q:    So he doesn't leave the parking lot area;
> right?
>         A:    No.
>         Q:    So what happens next?
>         A:    So I tell him again, and I'm not too sure at
> that time or another time I had to tell him again, but I
> know I had to tell him more than once.  And when he did
> listen, then he walked the path I showed earlier on Awanei.

(Emphasis added.)  On cross-examination, Officer Woo acknowledged that the report he wrote after the incident did not contain a description of either of the males, nor did the report include any reference to either of them refusing to leave.  On re-direct, Officer Woo testified that, an hour-and-a-half after he left the initial call, he was called back to the same residence for a "med assist, a defib-type case."

### 6.    The State's Closing Argument

The State's closing argument repeatedly referenced the rebuttal testimony of Officer Woo.  The prosecutor sought to establish that, contrary to David's testimony, David acted aggressively by refusing Officer Woo's instructions to leave Kikku's Awanei Street apartment.  The State emphasized that it was necessary for Officer Woo to ask David to leave the apartment area several times.  In so doing, the State used Officer Woo's testimony to depict David's uncooperative state of mind shortly before he stabbed Albert:

15

> [T]he defendant goes onto [sic] say, well, the police came over, but I don't talk to them. That's an outright lie. <u>Not only was he spoken to, he was told to leave the premises twice by Officer Woo.</u> Officer Randall Woo.
>
> . . . .
>
> Now, bear in mind one-and-a-half hours later at 1:00 AM Officer Woo is called back to the same address, this time somebody is dead. It was a different call, a defigrillator [sic] call. But he eventually found out this is a homicide. Somebody died. And the suspect is . . . the same guy with the ponytail.
>
> And [Officer Woo] goes over, but the thing is the officer realizes, you know, what happened at 11:20 in the evening an hour-and-a-half earlier <u>may be important</u>. So I better make a miscellaneous pub report of that to document that I did go over to that house earlier <u>because I may not remember if this ever becomes important.</u>
>
> [H]e looks at that report he remembers the guy with the ponytail. <u>The guy that I had to tell twice to leave. Is that the sign of a guy that's scared as he would have told us?</u> That's the first signs at least we have from Officer Woo that we have a person who's not very cooperative, who refuses to leave the premises. . . . <u>[Albert] left the premises immediately. It was Mr. David that Officer Woo had to ask several times to leave</u>.

(Emphasis added.) Accordingly, the prosecutor directly relied on Officer Woo's testimony, which described David's repeated refusal to follow the officer's orders despite being told to leave the premises "several times," in order to demonstrate that David was not "scared as he [] told us," contradicting David's testimony that he acted in self-defense.

**7.    Verdict and Sentencing**

On October 13, 2011, the jury returned its verdict. As to count I, murder in the second degree, the jury found David guilty of the lesser included offense of manslaughter. As to count II, assault in the second degree, the jury found David

16

guilty of the lesser included offense of assault in the third degree.

At the sentencing hearing on January 24, 2012, the State asked the court to impose a twenty-year sentence for the manslaughter conviction in order to send a message to the Micronesian community that it is unacceptable to drink alcohol and engage in violence:

> You know [David] comes from Micronesia, from Chuuk, and well, in this case, would provide just punishment for the offense.
> But what I wanted to focus on, Your Honor, is does this sentence under subsection B2, subsection B, afford adequate deterrence to criminal conduct?
> And when I talk about, perhaps, a sentence like this could save lives, I'm talking about sending a message to the Micronesian community.
> Even more so than just a community, but I say this, by no means to be a racist about anything, but in my experience, and I believe in the Court's experience, as well as Mr. Aquino's experience, over the past few years, we have had a number of cases that have come in involving Chuukese, Micronesian males drinking, not high on drugs, like type of cases we're more used to seeing, high on drugs, try to get drugs, commit offenses because of the need to get drugs or being high on drugs.
> But we're talking Micronesians who get inebriated on alcohol, then become violent with their own family members, their own friends and they involve knives.
> It is the exact same situation that is before the Court today, and when you think about a sentence that needs to send a message out to the Micronesian community, mainly the males, the idea that they can just drink all they want and not be responsible for what happens after that, I think this would send a strong message to them that that is not acceptable in the laws of the United States and the laws of the State of Hawaiʻi.
> So we're talking about affording adequate deterrence of criminal conduct by sending a message.

When delivering the sentence, the court made the following remarks:

17

> I think the root of all evils in this case was, obviously, alcohol.
> Those of you who are in the gallery, you seen or you - you see the devastating effects that alcohol can cause.
> I guess it's fun and it tastes good when you're drinking it at the time, but the taste of alcohol, obviously, doesn't taste good as you sit there today.
> No one can stop you from drinking alcohol, but those of you who are from the Micronesian Islands, you come here to start a legacy, and in this legacy, you don't need that legacy tarnished by alcohol, because alcohol will leave the legacy of people getting killed and people being prosecuted and standing before a Court for wrongdoings. That's not what you need.
> But my sentence today is not to send a message to you. My message today is to address the specific conduct of Mr. David.

The court sentenced David to twenty years imprisonment on count I and one year imprisonment on count II, to run concurrently.

B.      **Intermediate Court of Appeals**

The ICA affirmed David's conviction, holding that the court did not abuse its discretion in allowing the State's rebuttal witnesses to testify. However, the ICA vacated David's sentence and remanded for resentencing, on the grounds that comments made by the prosecutor during sentencing were "highly improper" and that the circuit court judge "did not go far enough to make its repudiation of the prosecutor's improper arguments clear on the record." The ICA held that "a defendant's race, ethnicity, or national origin cannot be used as a justification for the imposition of a harsher penalty on

the defendant."  The ICA therefore remanded for resentencing before a new judge.

## C.    Application for Writ of Certiorari

In his application for certiorari to this court, David presents two questions:

> I.    Whether the ICA gravely erred in holding that the trial court did not abuse its discretion by allowing the State to present the testimony of two rebuttal witnesses.
>
> II.   Given the egregious misconduct of the [DPA] during the sentencing hearing, whether the ICA gravely erred in remanding this case for resentencing rather than for a new trial.

## III.    STANDARDS OF REVIEW

## A.    Admissibility of Rebuttal Testimony

"With respect to the admissibility of rebuttal testimony, the standard on appeal is abuse of discretion.  This court has declared that '[t]he introduction of evidence in rebuttal and in surrebuttal is a matter within the discretion of the trial court and appellate courts will not interfere absent abuse thereof.'"  Duncan, 101 Hawaiʻi at 274, 67 P.3d at 773 (2003) (quoting Takayama v. Kaiser Found. Hosp., 82 Hawaiʻi 486, 495, 923 P.2d 903, 912 (1996)).

## B.    Abuse of Discretion

"The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party

19

litigant." State v. Plichta, 116 Hawaiʻi 200, 214, 172 P.3d 512, 526 (2007) (internal quotation marks and citation omitted).

C.   Prosecutorial Misconduct

"Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction." State v. Rogan, 91 Hawaiʻi 405, 412, 984 P.2d 1231, 1238 (1999) (quoting State v. Sawyer, 88 Hawaiʻi 325, 329 n.6, 966 P.2d 637, 641 n.6 (1998)) (internal quotation marks and citations omitted).

"Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." State v. McGriff, 76 Hawaiʻi 148, 158, 871 P.2d 782, 792 (1994). "In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, [the appellate court considers] the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against defendant." State v. Agrabante, 73 Haw. 179, 198, 830 P.2d 492, 502 (1992).

20

## IV.   DISCUSSION

### A.   Officer Woo's Testimony Was Inadmissible on Rebuttal and Its Admission Was Not Harmless Error

David argues the circuit court abused its discretion by allowing Officer Woo to testify as a rebuttal witness because the State was required to introduce Officer Woo's testimony in its case-in-chief under Duncan.[11]  According to David, Officer Woo's rebuttal testimony that David refused to leave the parking lot established David's belligerent state of mind prior to the stabbing, thus suggesting that David possessed the requisite criminal intent to commit the murder of Albert and the assault of Kikku.  Consequently, David maintains that the State was required to introduce Officer Woo's testimony in the State's case-in-chief, citing Duncan.  See Duncan, 101 Hawai‘i at 276, 67 P.3d at 775 ("[A] party is bound to give all available evidence in support of an issue in the first instance it is raised at trial and will not be permitted to hold back evidence confirmatory of his or her case and then offer it on rebuttal.").  The State maintains it did not expect David to testify that he did not speak with the police that night, and

---

[11]    David's application for writ of certiorari purports to challenge "two rebuttal witnesses," but only raises objections to the testimony of Officer Woo (not the State's other rebuttal witness, Erick Sam).  Accordingly, we only discuss Officer Woo's rebuttal testimony.

therefore Officer Woo's testimony was offered in rebuttal merely to contradict David's testimony.

The State explained its need for Officer Woo's rebuttal testimony during a bench conference. As its offer of proof, the State informed the court that Officer Woo responded to the call at the Awanei Street address and "spoke to both [Albert] and the defendant, which is contrary to what the defendant has testified to." Defense counsel objected to the rebuttal testimony based on Duncan, arguing that the State should have introduced his testimony during its case-in-chief. The State argued that Officer Woo was being called in rebuttal because the State "did not know at the time prior to the defendant testifying [] that he [would say that he] didn't speak with the police" and that Officer Woo's "offer of testimony would be, that he did speak, he spoke with both [Albert] and the defendant." Defense counsel again objected, arguing that the State was "aware of this officer, they were aware what the officer was going to testify to, they had the police report." The court overruled the defense's objections to Officer Woo's rebuttal testimony. After David's direct testimony, the trial was recessed for the weekend.

The State began its cross-examination the following Monday. At no time prior to the cross-examination – or prior to

Officer Woo's subsequent rebuttal testimony - did the State disclose to David or the court its intent to also introduce to the jury through its rebuttal witness David's uncooperative refusal to comply with Officer Woo's order to leave the apartment area where David later stabbed Albert.  During David's cross-examination, the State confirmed with David that he had not spoken to the police.  The State then called Officer Woo as a rebuttal witness.

### 1. Officer Woo's Testimony Identifying David as Uncooperative was Inadmissible on Rebuttal

As it proposed in its offer of proof, the State called Officer Woo to testify in rebuttal for the ostensible purpose of impeaching David.  However, rather than limiting the officer's testimony to the fact that he did speak to someone matching David's description in the Awanei Street parking lot, Officer Woo presented testimony that went far beyond impeachment evidence as it instead adduced substantive evidence of David's uncooperative behavior preceding his altercation with Albert. Thus, as David observed in his opening brief to the ICA, under "the guise of impeaching Defendant's credibility" the State presented testimony on rebuttal that went beyond the purpose represented in its offer of proof.  In so doing, it improperly bolstered the State's case that David acted as the first aggressor in unjustifiably causing the death of Albert.

23

By using this tactic, the State exceeded the scope of rebuttal testimony permitted by the court, which the court allowed only for the "limited purpose" of impeaching David's testimony that he did not speak to the police. Initially, Officer Woo's rebuttal testimony stayed within the parameters established by the court. Officer Woo refuted David's testimony that neither David nor Albert spoke to the police on the night of the incident. He stated that he arrived at the Awanei Street apartment at approximately 11:30 p.m. on the evening of January 1, 2011 in response to a "suspicious circumstance" call from a female at the same address. Upon arrival, he spoke to the female who called him. Subsequently, Officer Woo spoke to two males in the parking lot; he identified one as "a Micronesian male with a ponytail."

Thereafter, Officer Woo's testimony far exceeded the limited scope of rebuttal testimony permitted by the court. In addition to contradicting David's testimony on cross-examination that he did not talk to the police prior to the incident, Officer Woo testified that the male with the ponytail was uncooperative and refused to leave the parking lot after Officer Woo's multiple orders. Officer Woo testified that he told the two males they needed to leave the area because "the female wanted them to leave," but the man with the ponytail did not

24

leave immediately, despite repeated orders by Officer Woo. Officer Woo stressed that, unlike the usually cooperative people he encounters, David did not cooperate when he told him to leave the area: "[m]ost times when we tell people they need to leave they'll just turnaround [sic], walk away. . . . This gentleman stayed in the parking lot and I told him one or two more times that he needed to go." To this testimony, the defense properly objected on the basis of speculation and improper bolstering. Officer Woo's view of how other people would behave in David's place constituted speculation as to what other people would do in David's situation; his testimony also bolstered his testimony by comparing David's behavior to that of most people who would have cooperated with police instruction.

With the defense's first objection overruled, the State continued offering testimony that exceeded the scope of testimony permitted by the court. Officer Woo noted that, after "the other male" left the area, his "main concern was the individual with the ponytail because [he] had to tell him more than once to leave." The defense asserted another objection to the unexpected testimony, citing HRE Rule 404(b). Defense counsel established that Officer Woo's testimony improperly introduced substantive evidence of prior bad conduct – thereby exceeding the limited scope of rebuttal testimony. HRE Rule 404

25

proscribes the use of character evidence to prove conduct,

subject to exceptions:

> (a) Character evidence generally.  Evidence of a person's character or a trait of a person's character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:
>     (1) Character of accused.  Evidence of a pertinent trait of character of an accused offered by an accused, or by the prosecution to rebut the same;
>     (2) Character of victim.  Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;
>     (3) Character of witness.  Evidence of the character of a witness, as provided in rules 607, 608, 609, and 609.1.

HRE Rule 404(a).  In criminal cases, the proponent of evidence

of other crimes, wrongs, or acts probative of another fact of

consequence "shall provide reasonable notice in advance of

trial, or during trial if the court excuses pretrial notice on

good cause shown, of the date, location, and general nature of

any such evidence it intends to introduce at trial."  HRE Rule

404(b).  Here, Officer Woo's testimony fell within the

proscription of HRE Rule 404(b) because it presented evidence of

David's bad character:  his multiple refusals to comply with

Officer Woo's orders to leave the premises.

Even supposing that the State could show good cause

for not providing reasonable notice of this character evidence

in advance of trial, reasonable notice was required during trial

once it became known to the State.  Although the State provided

26

Officer Woo's police report, the report did not identify David or Albert, and it only explained that the police spoke with an undescribed male, saying nothing about the male's refusal to comply with Officer Woo's repeated orders to leave. Thus, the State exceeded the scope of rebuttal testimony allowed by the court and failed to give reasonable notice that substantive evidence of David's bad character would be presented in rebuttal. Given defense counsel's timely objections to Officer Woo's testimony as it exceeded the limited scope permitted by the court, the testimony depicting David's unwillingness to comply with repeated, direct orders from a uniformed officer was inadmissible on rebuttal.

> 2.   **The Erroneous Admission of Officer Woo's Rebuttal Testimony Was Not Harmless**

The introduction of Officer Woo's improper rebuttal testimony over the defense's objections was not harmless. In Duncan, we held that improper testimony impeaching a defendant's credibility on rebuttal was not harmless when the defendant's credibility was "the linchpin of his defense" because there was a "reasonable possibility that the erroneous admission of [the witness's] testimony contributed to [the defendant's] conviction." Duncan, 101 Hawaiʻi at 278, 67 P.3d at 777.

Similarly, David's demeanor leading up to the altercation was a "linchpin of his defense." It was relevant to

his claim that he acted in self-defense. Officer Woo's testimony refuted David's self-defense claim because David's uncooperative behavior with Officer Woo tended to show that David acted as the first aggressor in his altercation with Albert. Indeed, in closing argument, the State argued against David's contention that he acted in self-defense by citing Officer Woo's improper rebuttal testimony to demonstrate that David was not scared in his altercation with Albert. The State stressed that David was "not very cooperative"; and noted that Officer Woo had to tell David to leave "several times" in contrast to Albert, who "left the premises immediately." After comparing David's refusal to cooperate with Albert's cooperative behavior, the prosecutor asked the jury "[i]s that the sign of a guy that's scared as he would have told us?" Thus, Officer Woo's testimony comparing David's uncooperative behavior to Albert's impliedly cooperative behavior constituted a formidable confirmation to the jury that David unjustifiably killed Albert.

Moreover, Officer Woo's rebuttal testimony identifying David as uncooperative carried the great persuasive import of an inherently credible and objective police officer observer. Its importance to the State's case was paramount. In its case-in-chief, the State elicited testimony from Kikku seeking to show that David was drunk and acted aggressively towards Albert on

28

the night of the murder.[12]  Officer Woo's testimony, specifically describing his repeated statements to David and David's refusals to comply, substantially reinforced Kikku's direct testimony. The only witness who testified to seeing the initial altercation between David and Albert besides David himself was Kikku, Albert's aunt.  Officer Woo's improper rebuttal testimony provided contradictory evidence to David's testimony regarding who was the first aggressor.[13]  Thus, given that the rebuttal testimony described David's uncooperative state of mind prior to his stabbing of Albert, there is a reasonable possibility that Officer Woo's testimony depicting David as repeatedly refusing to comply with his orders contributed to David's conviction.  We hold that the erroneous admission of Officer Woo's rebuttal testimony was not harmless.

---

[12]  Kikku testified that David had demanded all the beer that Albert had refused to give to David before leaving Kalihi and going to the Awanei Street apartment; that David was not invited into the Awanei Street apartment; and that David appeared to threaten Albert by telling him "no man can do this to me" in response to receiving a scratch on the nose from an earlier altercation.  The State also elicited testimony from Arlynn Ewen Moses, who corroborated Kikku's testimony that David was not invited into the Awanei Street apartment and that David and Albert had been fighting earlier in the evening.

[13]  Kikku testified that she saw David hit Albert in the back of the head, but she did not witness the fatal stabbing.

B.      **Improper Comments During Sentencing**

Because we rule in favor of David regarding part of his first question on certiorari, holding that the erroneous admission of Officer Woo's rebuttal testimony was not harmless, we need not resolve his second question:  whether improper statements by the prosecutor at the sentencing hearing required a new trial rather than the resentencing ordered by the ICA. Based on the importance of the second question, however, we exercise our supervisory powers under HRS § 602-4 (2016)[14] to provide guidance to the trial courts.

In his opening brief to the ICA, David argued that the prosecutor's "racist and sexist remarks" improperly influenced the circuit court.  The ICA held that the prosecutor's comments were "highly improper" and that the circuit court judge "did not go far enough to make its repudiation of the prosecutor's improper arguments clear on the record."  The ICA therefore remanded for resentencing before a new judge.

We concur with the ICA that comments made during the sentencing hearing[15] were improper.  See Rogan, 91 Hawai'i at 414-

---

[14]     HRS § 602-4 provides, "Superintendence of inferior courts. The supreme court shall have the general superintendence of all courts of inferior jurisdiction to prevent and correct errors and abuses therein where no other remedy is expressly provided by law."

[15]     The prosecutor's relevant remarks at sentencing, as excerpted in part II.A.7. above, were as follows:

(. . . continued)

15, 984 P.2d at 1240-41 ("[A]rguments by the prosecution contrived to stimulate racial prejudice . . . threaten[] our multicultural society and constitutional values. . . . [A]ppeals

_____

(continued. . . )

> You know [David] comes from Micronesia, from Chuuk, and well, in this case, would provide just punishment for the offense.
>
> But what I wanted to focus on, Your Honor, is does this sentence under subsection B2, subsection B, afford adequate deterrence to criminal conduct?
>
> And when I talk about, perhaps, a sentence like this could save lives, I'm talking about sending a message to the Micronesian community.
>
> Even more so than just a community, but I say this, by no means to be a racist about anything, but in my experience, and I believe in the Court's experience, as well as Mr. Aquino's experience, over the past few years, we have had a number of cases that have come in involving Chuukese, Micronesian males drinking, not high on drugs, like type of cases we're more used to seeing, high on drugs, try to get drugs, commit offenses because of the need to get drugs or being high on drugs.
>
> But we're talking Micronesians who get inebriated on alcohol, then become violent with their own family members, their own friends and they involve knives.
>
> It is the exact same situation that is before the Court today, and when you think about a sentence that needs to send a message out to the Micronesian community, mainly the males, the idea that they can just drink all they want and not be responsible for what happens after that, I think this would send a strong message to them that that is not acceptable in the laws of the United States and the laws of the State of Hawai'i.
>
> So we're talking about affording adequate deterrence of criminal conduct by sending a message.

(Emphases added.)

In addition, as also excerpted in part II.A.7., above, although the court stated that its sentence was not to send a message to the Micronesian community, it referred to the community before imposing sentence.

to racial prejudice lack the professionalism and decorum required of attorneys who practice before the bar of the courts of Hawaiʻi and will not be tolerated."). The ICA also correctly concluded that the circuit court did not meet its burden to repudiate the improper remarks made by the prosecutor when he appealed to race in arguing for a sentence that would "send a message to the Micronesian community."

## V.    CONCLUSION

Based on the foregoing, we vacate the ICA's judgment on appeal and the circuit court's judgment of conviction and sentence, and remand the case to the circuit court for a new trial.

Craig W. Jerome
for petitioner

James M. Anderson
and Loren J. Thomas
for respondent

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson

